First case in our call this morning is case number 106804, MidAmerica Bank FSB v. Charter One Bank FSB. Counsel, you may proceed, Mr. Williams. Good morning, and may it please the Court. My name is Patrick Williams, and along with Vince Mancini, we represent MidAmerica Bank. Your Honors, attempting to navigate Article III and Article IV of the UCC can be a legal minefield, fraught with esoteric terminology, statutory pronouncements subject to multiple exceptions, and qualifications spanning several sections. While a statutory section under these articles may consist of a few short lines, the Code comments can go on for pages and include multiple case studies as examples. This case, however, is one that can and should be summarily decided in favor of MidAmerica Bank, since stop payment orders on cashier's check are not permitted under the Illinois UCC. The Appellate Court, however, the Second District Appellate Court, has determined that a plain reading, a plain reading of the 1992 amendments to the UCC overrules established Illinois authority on the law, and that the cash equivalency notion of cashier's checks has now been dashed. We submit that even if the demand note approach now propounded by the Appellate Court is to apply with respect to cashier's checks, the Appellate Court in this case misapplied that note approach here. Finally, when the Appellate Court ruled that MidAmerica was not entitled to recovery of the cashier's check, the Court never reached the issue of the recovery of attorney's fees under Section 3-411. We submit that that issue should be decided here. Mr. Williams, does this case boil down to whether this Court wants to accept the cash equivalency approach or the note approach? Or a version of the cash equivalency approach, Your Honor. I don't believe it necessarily involves an either or. I submit that there is authority, competent case authority, the ABLE decision specifically, that would say that the cash equivalency approach should apply. The Appellate Court of Illinois, Second District, says the note approach is the order of the day, which we submit is inappropriate, even under the cases and treatises that discuss this issue. Would you agree that there are code provisions to support either approach? I would submit that there are code provisions that support the notion that a bank may dishonor a cashier's check under certain limited circumstances. And I further submit that those circumstances are not present in this case. The trial court in this case found that the cashier's check was as good as currency and that Charter I was obligated to pay the cashier's check. As I'm sure you're aware, the trial court entered judgment in favor of MidAmerica on the $50,000 cashier's check. There is a critical and uncontested fact, which, although it was recognized by the appellate court, is never reconciled as part of this decision. And that's part of what I'm getting at, Justice Thomas. This case involves the issue of a stop payment placed on a cashier's check at the purchaser's request. That's it. The reason for the dishonor was because the customer requested it. In other words, there is no issue in this case that the failure of Charter I to pay the check was solely due to the request of its customer, Mary Christel, to stop payment on the instrument. Now, we know that there is a fairly well-established line of authority, both statutory and case authority, that prohibits this type of action, simply stopping payment because the customer requests it. Section 4-303 of the current code states that any stop payment, order, or set-off exercised by a payroll bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account  Furthermore, in the case code comments to Section 4-403, the drafters unequivocally state, if a bank issuing a cashier's check refuses to pay the check as an accommodation to its customer or for some other reason, its liability on the check is governed by Section 3-411. There is no right to stop payment after certification of a draft. And this is true no matter who procures the certification. The drafters' comments to Section 3-411 echo this same view. In the case of a cashier's or certified check, they write, the bank can safely pay the holder of the check despite notice that there may be an adverse claim to the check. A debtor has no right to stop payment. Nevertheless, some banks will refuse payment as an accommodation to a customer. Section 3-411 is designed to discourage this practice. These legislative pronouncements were recognized and adopted by the First District Appellate Court in the Abel decision. The Abel Court also was sensitive to larger policy concerns when it opined that to allow a bank to stop payment would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. Based upon this bright line of authority in Illinois prohibiting stop payment orders on cashier's check, there appears to be little doubt that Charter 1 stop payment and refusal to pay the cashier's check was wrongful. Now, rather than focusing on the stop payment issue and the precise basis for Charter 1's dishonoring the cashier's check, the Appellate Court, sua sponte, embarks on a legislative analysis of the impact of the 1992 revisions to the UCC. Noting that the leading case, the Abel decision, predates the 1992 amendments, the Court indicated that the current version of the Code and the plain language of Section 3-412 supports the notion that cashier's checks are no longer to be treated as the equivalent of cash but rather as a note with all of the defenses to enforcement of a note to be applied. Can we assume that in the face of the Abel decision in 1979, the General Assembly in 1992 adopted the amendments of the UCC that went the opposite way? Well, Judge, my response to that would be that the language that the Court relied on, the Appellate Court relied on in overruling the cash equivalency notion, was identical word for word for that which was contained in the Code prior to the amendments. And we have gone through and analyzed the language both pre-1992 and post-92. In both instances, it says the issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument according to its terms at the time it was issued. Now, I submit if there's been no change in either the language, the legislative pronouncement in the statute, nor has there been any change in any of the Code comments, nor has there been any even indication or indicia from those comments that Abel was to be overruled, I submit that that makes a strong argument that the Abel decision should stand as good law. It's your position, Mr. Williams, that the revisions that were made after the Abel case have little, if anything, to do with the issue addressed in Abel, right? Well, Judge, I would submit, yes, I would submit that the appellate court That's stronger than your position appears from your reaction. Judge, I don't know where the appellate court drew its source by quoting the language in 3-412 to state or to conclude that cashier's checks were now going to be treated differently than they were in the past. I submit that the language of 3-412, both pre- and post-revision, being identical, identical to the word, that that language supports the notion in the face of Abel that the Abel decision was to stand. Mid-America further notes that if the demand-note approach applies now under the Second District ruling, under the revised UCC, the appellate court erred in its application in this case. Now, we are well aware that the trial court made a finding that ETI perpetrated a fraud on Charter I Bank and that the appellate court concluded that that finding was not against the manifest weight of the evidence. We submit that the trial court's finding was against the manifest weight of the evidence. Since there was no evidence in the record to support the claim that ETI had any contact whatsoever with Charter I Bank, much less that Charter I was fraudulently induced to issue the cashier's check by ETI's conduct, the only conduct, or arguably fraudulent conduct, was that of Mary Christel, as she was the one who made the deposits into her account, which led the bank to issue its cashier's check. While there may have been overwhelming evidence that David Hernandez, the president of ETI, stole money from his wife and mother, that he forged documents, that he coerced and abused his family members, there was no evidence that ETI partook in any of this. Interestingly, no claim was ever made against David Hernandez, nor was any judgment ever even entered against him. More importantly, however, is that Charter I's own security officer testified unequivocally that she was never able to determine that ETI was involved in the issuance of the cashier's check or that it caused Mary Christel to purchase the check. Coupled with the additional fact that there was never any pleading alleging any type of fraudulent conduct on the part of ETI, there is absolutely no basis to sustain the finding. This, I submit, is one of those very limited circumstances where a finding is against the manifest weight of the evidence. Finally, none of the defenses of Charter I Bank as the obligor under Section 3-305 are available here, since the only reason Charter I refused to honor the check was simply the stop payment request by its customer. Put another way, Charter I's basis for the dishonor of the cashier's check bears no relationship to the defenses of Charter I as obligor to enforcement under Section 3-305. There's the dichotomy. They stopped payment on day one because the customer requested it. On day two, three, four months later, they determine a fraud defense. That was not the basis of the dishonor. That is uncontested and uncontroverted here. And the law in the state of Illinois, both pre-revisions, both post-revision, in all of the case authority, in all of the case authority of other jurisdictions, states that a stop payment order cannot be placed on a cashier's check at the request of its customer, period. Now, with respect to the recovery of attorney's fees and interest, the trial court held that the Negro Ness decision barred the award of attorney's fees under Section 3-411. The appellate court never reached this issue, of course, since the court found that Mid-America was not entitled to enforcement of the instrument. Charter I offered no argument whatsoever on this subject in its brief. The operative language under Section 3-411 is that if the obligated bank wrongfully refuses to pay a cashier's check, the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment. While the Negro Ness decision did not involve Section 3-411, but rather a contractual provision on collection costs, the court recognized that an exception to the prevailing American rule, as it is, was evident in the case of negotiable instruments. The code comments to Section 3-411 buttress this argument that attorney's fees are included as, quote, expenses, unquote. The trial court, Mr. Williams, although agreeing with your initial proposition, declined Mid-America's request for attorney's fees, right? That is correct. So what would you have this court do if we agreed with the cash equivalency approach with respect to the attorney's fees? Judge, I think that this falls squarely within the provisions of 411 and that there was a wrongful failure of the bank to pay the cashier's check and that expenses, the term expenses, as provided for under Section 411, include the aspect of recovery of attorney's fees. So what you have is remand it to the appellate court? Remand for? On the attorney's fees issue? Well, I definitely, well, I think that this court can make that determination. It is true that the appellate court never reached the subject. However, it seems that that process may be somewhat cumbersome in light of the underlying and the principle basis upon which this, I think, this appeal is before you. And what did the trial court do? The trial court, did they give any rationale as to declining the request for attorney's fees? The bright line of the American rule, Your Honor. It's not specifically stated. The words attorney's fees don't appear. Therefore, attorney's fees, since they're not specifically provided by statute or by contract, attorney's fees are not permissible. We submit, though, Judge, that the Negro Ness decision carved out this exception and further that the committee comments to 411 buttress the argument. The committee comments state, if the obligated bank wrongfully refuses to pay, it is liable to pay for the expenses and loss of interest from the refusal to pay. There is no express provision for attorney's fees, but attorney's fees are not meant to be necessarily excluded. They could be granted because they fit within the language, quote, expenses, unquote, resulting from the nonpayment. I guess my point is the trial court, did the trial court ever have a hearing? They never got to the point of whether the attorney's fees were fair and reasonable, right? There was never. We submitted an affidavit in support of the attorney's fees, Judge. There was never a hearing as such on the reasonableness of those fees as part of any type of judicial determination. It never got that far, quite frankly. That's what I was saying. Yes. Thank you. Clearly, an award of attorney's fees and interest as part of the recovery against an obligated bank that wrongfully refuses to pay a cashier's check is consistent with the notion that Section 3-411  It also clearly appears to be what the legislator intended, although not specifically stated. Awarding MidAmerica the $50,000, which is the amount of the cashier's check, but denying the attorney's fees in excess of $33,000 in collecting that check through contested litigation does not meet the legislative intent we submit of Section 3-411. In conclusion, both the current and former versions of the UCC prohibit banks from placing stop payment orders on cashier's checks at the mere whim of their customer. There is no statutory authority or case authority that allowed Charter 1 to stop payment on the $50,000 cashier's check, and it should be held liable to MidAmerica as an assignee of the rights of ETI or the payee of the check. While the appellate court has opined that the 1992 revisions to the UCC have overruled the established authority in Illinois that cashier's checks are to be considered cash equivalent, neither Section 3-12 nor the code comments interpreting that section support the appellate court's conclusion. Is that how you distinguish the 2008 Michigan case? The federal court in Michigan, EA Management v. J.P. Morgan Chase Bank. Do you distinguish that just on the basis that it's a federal court? Judge, I think first of all in that case it was not a stop payment issued by its customer. Secondly, that case recognizes that there may be certain limited circumstances under which a cashier's check can have payments stopped. Again, not when the customer requests it. There are limited circumstances, and I submit that there is a line of authority. We can't be oblivious to that, but there is a line of authority that will carve out certain narrow circumstances. Those circumstances are not present in this case, but in other cases where the bank has been defrauded. And I submit that Section 3-411 provides some guidance there. In 3-411B, where it talks about if the obligated bank fails to pay because the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument, or the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument. So, for example, the bank is aware that the person presenting the cashier's check or the payee of the check is a thief. Should the bank be allowed to dishonor the instrument? I submit yes. If it's apparent that the cashier's check has been materially altered, should they be allowed to stop payment on the check? Yes. I think there has to be a balancing at the end of the day between the notion that we need cashier's check, we need the certainty of payment that the cashier's check provides, with the balance that the bank has legitimate concerns in paying these out. Now, where the court falls on the spectrum is, I guess, yet to be seen. But for the appellate court to say, no, a cashier's check is now a demand note. A demand? I'm sorry, Judge. What's the standard of review that the appellate court did? I'm sorry, Judge? On the decision by the appellate court. The decision, the appellate court's decision of the trial court's decision? What is our standard of review here? I believe it's de novo because it's a question of law that this court is asked to consider. I submit, to finish my point, I realize I'm out of time. Take one minute. Thank you, Judge. The point is that there has to be some melding or blending of the interest of the public and the public confidence in cashier's check. We have to consider the purpose of the UCC in trying to advance commerce. And I submit that the appellate court decision, which places a cashier's check on a par with a personal check, fails on all accounts. Do those considerations fall outside of the realm of the standard of review that you said should apply here? I don't believe they do, Judge. I believe that those are clearly within the parameters of the statute, and I believe I'm not asking this court to judicially legislate. I think that there are provisions in Section 4-111 that specifically provide a basis for this court to make that assessment. I would ask that the decision of the appellate court be reversed and that the case be remanded to the trial court for purposes of consideration of the attorney's fees under Section 3-411. Thank you, Your Honor. Good morning, and may it please this honorable court, and to my colleagues, Mr. Williams and Mr. Mancini, my name is Richard Nogle. I'm with the Burridge, Illinois, firm of Goldstein, Skrotsky, Russian, Nemec, and Hoth. We represent Charter 1, the appellee in this matter. Assisting me today and on the briefs is Mr. Christopher Novak, an associate attorney with our firm. Mr. Nogle, because I know this isn't where you're going to start, but it is where Mr. Williams left off. The public policy argument, I believe, that what would be the difference under the appellate court rationale, and as you would have this court rule, between a cashier's check and any other check? Well, for seven years in the appellate court and the briefs, MidAmerica has argued that there are no circumstances under which a cashier's check can be dishonored. Mr. Williams seemed to be backing off of that position slightly in saying that there should be some type of balancing approach. The revisions to the UCC, Sections 412 and 411, clearly address that question and adapt the sound public policy that a perpetrator of fraud, a thief, should not benefit from a thief's wrongdoing. In this case, ETI was a thief. The trial court found ETI to be a thief and that a thief and a wrongdoer should not benefit from the wrongdoing. So clearly public policy should not place the burden on an innocent bank that was a victim of fraud. And MidAmerica stands in the shoes, by way of this assignment, in ETI's stead. And so therefore public policy clearly would favor placing the loss on ETI. So where you differ then with Mr. Williams is not so much on what approach should be used. Your position is that the note approach was properly used here because the circumstances which Mr. Williams says are not in play, you say are in play. Yes, so we favor. Obviously we believe that the amendments to the UCC, 411 and 412, were specifically designed to cure and to bring into uniformity this split in authority between the note approach and the cash equivalency approach. Commentators would argue that the ABLE course got it wrong, that the UCC always articulated and mandated the note approach and that's why there was extensive amendments to sections 411 and 412 to cure this dichotomy and split in the authority. And the commentators and the cases construing the UCC since it was amended in 1992 have all favored the note approach for the reasons I would like to articulate. And I'd like to get into the amendments. Before you get into that, do you agree with your opposing counsel that the standard of review here is de novo? Yes, on the question of law, yes. We believe that the manifest weight of the evidence standard should apply to the facts that were found by the trial court. The fact includes the finding of fraud? Yes. And I would like to address those facts. MidAmerica argues that there's insufficient support in the record to support the finding of fraud and we believe the record clearly and amply establishes fraud on the behalf of ETI. The cashier's check was purchased with a $50,000 home equity check from David Hernandez's closed or insufficient home equity account. He intimidated his mother to deposit that check into Charter One's account and use those funds to purchase the cashier's check. Mr. Hernandez was president of ETI. ETI was the sole beneficiary of the fraud in this case. And four days after this home equity, this faulty insufficient home equity check was placed into Charter One, Christel went and tried to purchase a cashier's check from Charter One. Since four days had elapsed, Charter One did issue that check based on funds availability. The check was returned a day or two later with insufficient funds, while Christel and Hernandez went over to MidAmerica immediately and deposited that check into ETI's accounts at MidAmerica. Christel, for some reason, a few days later has second thoughts and goes to Charter One and orders a stop payment on that check. I think an important fact is that MidAmerica sustained no loss on the cashier's check. Because of the stop payment order, Charter One issued the stop payment order. It was actually processed by MidAmerica. So MidAmerica processed the stop payment order, withdrew the funds from ETI's account, and returned the check to ETI. What happened here was because Hernandez and ETI were committing ongoing fraud,  and deposited $52,000 in unrelated checks into MidAmerica's account, and that's what caused MidAmerica to sustain the loss here, not the $50,000 cashier's check. So MidAmerica sues ETI to collect on the $52,000 unrelated loss and takes an assignment of the cashier's check four months later. The cashier's check is issued January 18th of 2002. The assignment is taken May 15th, 2002, after the stop payment order, after MidAmerica honored the stop payment order, after the check has a big stop payment logo on the front of it, and with all of the knowledge of the fraud and defenses that Charter One had asserted. And that is the time frame at which we should look at the fraud, not what Charter One knew. A bank would never issue a cashier's check if it knew a fraud and the inducement at the time of issuance. The probative analysis is what did MidAmerica know when the check was negotiated to MidAmerica in May of 2002? We should not look at the time the stop payment order was issued? No. Is there anything in the record to indicate there was any foul play afoot when Christel asked for a stop payment order? Yes, all the return checks, all the fact that Christel's account was running about a two- That's in the record that Charter One knew that? Not at the instant the check was ordered. So at the time Charter One issued the stop payment order, it had no knowledge of any fraud? It had institutional knowledge because of the checks. I don't know that someone analyzed the account at that instance, but certainly the checks were being deposited. A $50,000 personal check was issued by Christel to ETI that came back insufficient funds. So Christel tried first to obtain a personal check to ETI based on the home equity account. That was returned for insufficient funds and then purchased the cashier's check. So certainly- You're arguing, I take it, that we can take a look at what happened after the stop payment order was issued, after the check was dishonored, to justify the stop payment. Certainly. And what was happening on or about the time the stop payment was issued as well because all this unusual check-kiting activity was going on before and after the cashier's check was purchased. Does the Obligor Bank have any obligation to determine when it issues a cashier's check whether there are sufficient funds in the DARS and DRAWERS account to cover that check? Yes. In this case, the home equity- to pay the check. The home equity account check had been deposited so it was there but then it was taken back a day or two thereafter. So at the time the cashier's check was issued- So they could have frozen that and honored the cashier's check. Well, the home equity check was returned for insufficient funds so there was never enough funds, real funds, in the account to pay for the cashier's check. It was because of the check-kiting. I'd like to address the 1992 amendments to the UCC. Mid-America's principal argument is that these amendments did not reflect any substantive changes in Sections 412 and 411. What Mid-America fails to address are the changes implemented by Public Act 87-582. There were two acts that amended the UCC, 87-1135 and 87-582. It is 87-582 that implemented the substantive changes and completely rewrote 412 and 411 but for some reason Mid-America mistakenly is concentrating only on 87-1135 which altered some minor words to those acts. For example, Section 412 was completely revised to adapt what we've called this note approach. It imposed the same obligations on the issuer of a note as on a cashier's check and thus equated notes and cashier's checks. It also provided under the revised 412 that the obligation of a bank to honor a cashier's check is only owed-and this is important-to a person entitled to enforce an instrument. So you have to analyze whether the person is entitled to enforce the instrument, in this case is Mid-America standing in the shoes of ETI. So revised 412 clearly adapts the note approach and also affords defenses to the cashier's check. Three simple words weren't amended in 412 as argued on page 17 of Mid-America's brief. The entire section of 412 was replaced. The same was done with Section 411. Section 411 of the code, which is the most applicable to the case at bar, was completely rewritten by Public Act 582. Section 3411 as amended, effective January 1, 1993, eliminated the provision that certification of a check is acceptance. And this tenet is what was relied upon by the court in Abel and the other courts that had adopted the cash equivalency approach in prior years. Instead, the revised language of Section 3-411 expressly allows a bank to insert its own defenses to a cashier's check and imposes liability on a bank only if it wrongfully refuses to pay that cashier's check. So there has to be some type of analysis as to whether Charter I rightfully or wrongfully dishonored this check. Contrary to Mid-America's brief, its reply brief at page 1, Section 3411 did not contain the word wrongfully in any prior iterations. That was completely revised and substituted by the amendments in 1992 and 93. The revised Section 3-411 also provides that no expenses or consequential damages are recoverable if a bank's refusal to honor a cashier's check is based upon a claim or defense against a person entitled to enforce the instrument, or if the bank, in this case Charter I, had reasonable doubt that the person holding the instrument had a right to enforce the instrument. And certainly, Charter I, under these circumstances, had reasonable doubt as to whether Mid-America, standing in the shoes of ETI, had the right to enforce this instrument. The UCC comments even provide that a bank may assert claims or defenses and recognize that these claims or defenses are going to be very narrow. This is a very unique, unusual case where fraud and inducement of the cashier's check was prevalent, and so this type of situation will not happen very often, even according to the commentators. So Mid-America erroneously relies on only Public Act 87-1135 and not 87-582 in arguing that the amendments to the UCC do not alter the decision in ABLE. Mr. Williams made a point of reading the prior language from Section 3-412 and the current, and there seems to be no change other than to the extent under pursuant to and as. Perhaps there's a change to 411. Do you disagree with that? Yes, because the Act 87-582, according to Illinois revised statutes, substantially rewrote this section. And what's the language now then? Of 411? 412. It was completely replaced and provides basically that notes and cashier's checks are equivalent. Well, it says the issuer of a note or cashier's check or other draft, which is the same language which was in the old one. Comparing these side by side, I don't see any difference, but perhaps there is in 411, so I want to know what is the difference. 412 was completely replaced, Your Honor. Again, before 1992, the Code said the issuer of a note or cashier's check or other draft drawn. Now it says the issuer of a note or cashier's check or other draft drawn. And it seemed to me that the appellate court said there was a complete change without explaining what the change was. I don't know what the change is. Well, we need to look at the wording in the prior version. The wording that the change provided took out the fact that notes and cashier's checks were defined cashier's checks and imposed the same obligations on the issuer of a note or a cashier's check. Are you reading language of the statute now or commentary? The language of the statute. And also afforded defenses and said that defenses and the obligation of a bank to pay the note or cashier's check is only owed to a person entitled to enforce the instrument and then allowed for these defenses. So I think the confusion is that we need to look at both public acts that amended 412 and we need to look in particular at Public Act 87-582, not just Public Act 87-1135, which I think is the source of confusion. I think Mid-America is only looking at 1135, a change to some minor wording, and these statutes were amended jointly by the new Public Act. As Justice Freeman noted, the ruling in the appellate court was affirmed by the district court in the J.P. Morgan case, which adapted the very same reasoning of the appellate court's second district in this matter. It rejected the argument advanced by Mid-America here, that a cashier's check cannot be countermanded for any reason and this notion contradicted the plain meaning of Section 411 of the UCC. The court in J.P. Morgan noted that the prior version, and this gets to Justice Carmier's comments, the court in J.P. Morgan addressed the very question proposed by Justice Carmier that the prior version of Section 411 did not address whether the bank could dishonor the check and that the new 411 did so and that fraud was a proper defense under the revised Section 411. And the pre- and post-amendment UCC sections in Michigan and in Illinois are the same. I should also note that Mid-America's position that a cashier's check cannot be countermanded for any reason is very much opposed with the language of 412 and 411. It would render all of the changes implemented by the General Assembly as being surplusage and meaningless and that's not a proper statutory construction nor does it make any common sense. The legislature did try through the amended UCC to address this confusion about whether the cash equivalency or note approach should be applicable to cashier's checks. In conclusion, on public policy grounds, cashier's checks will not be greatly impaired if a bank has narrow defenses to such cashier's checks. The floodgates were not open for banks to dishonor these checks because Section 411 imposes significant penalties on wrongful dishonor such as consequential damages and other damages. I would like to briefly address the attorney's fees issue. There was no finding by the trial court regarding Section 411 about wrongful dishonor, so there's been no finding at the trial court level about whether there's been wrongful dishonor on behalf of Charter 1. There's certainly been no finding about any fees nor has there been any finding about whether the statute 411 even provides for attorney's fees upon wrongful dishonor. Public policy should not allow Mid-America, standing in the shoes of ETI, to benefit from the fraud committed by Charter 1 and against Charter 1, I'm sorry, by ETI, and certainly the burden of a loss should be placed on the wrongdoer and not on an innocent bank such as Charter 1 in this case. So for these reasons, Charter 1 respectfully submits that the well-reasoned decision of the Appellate Court of Illinois Second District be affirmed. Thank you very much. Thank you, counsel. Mr. Williams. Thank you. There's just a few points that I wish to highlight in rebuttal. The points that you were raising, Your Honor, concerning the payment of the instrument, there is no doubt, no question, no issue that at the time the payment on the check was stopped, Charter 1 had knowledge of no impropriety. They chose to issue the cashier's check apparently with uncollected funds. They chose to give Mary Christel that check. Furthermore, and just as important, at the time the payment on the check was stopped, it was not stopped because of any perceived impropriety, any perceived lack of funds, any perceived check-kiting, any perceived fraud by ETI, David Hernandez, Mary Christel, Gina Hernandez, or anyone else. They stopped payment because Mary Christel asked them to, period. And that is a fact that gets all glommed up. Counsel, was there a specific factual finding at the trial level on this issue? On the issue of whether the payment? First of all, whether there was fraud and if there was a finding of fraud when the fraud occurred. Judge, there was a finding that ETI perpetrated a fraud. Yes. I will not dispute that finding by the trial court. And as I indicated in my earlier argument, that finding was against the manifest way to the evidence. The trial court ruled, though, that the check, based on the ABLE cash equivalency, had to be paid. It had to be paid. And that's where counsel's argument at the trial level was, well, wait a minute, there was this fraud that was involved. I submit that if there was the fraud, that that fraud came after the fact, and there is no authority anywhere that says you can build your case later or you can bootstrap, if you will, a defense to the nonpayment of the instrument when the instrument initially was dishonored because of the customer's request. And you raise another point, Your Honor, at what time are we looking at? I think we refer to this in our reply brief. The operative time is at the time that the instrument is presented for payment, for negotiation. And what occurred at that time? At that time, there was no evidence of any fraud at all. And again, something that apparently is discounted at the trial and the appellate levels is ETI's, let me strike that, is Charter One's own security officer who said, we could never tie him in. We couldn't tie ETI into this scheme. And somehow, someway, the abominations committed by David Hernandez are then foisted upon ETI. ETI is the payee of the instrument. What they got for it, I don't know. I can't say. But the fact is that this case, the facts of this case, deal with a very limited issue, the propriety of a stop payment order at a customer's request. That is prohibited. That is wrongful. That is wrongful under Section 411. And Section 411 provides for the payment of costs and attorney's fees when that happens. Now, the other argument, and again, I share your view. With all respect to Mr. Noble, all of these statutory revisions and rewritings that he's claiming and quite frankly that the appellate court seems to suggest that there was this massive revision of 411 and 412, it didn't exist. I sat down and did a very simple word by word, line by line, and I don't see it. And we have alleged in our briefs that we've reviewed the public acts and that there is no difference at all, that the language is precisely the same. The operative language is precisely the same. Now, at the end of the day, I submit that this court is going to have to reconcile the UCC and its goal in promoting commerce with the notion of the cashier's check. We all know that the cashier's check has importance because of its certainty, buying a house, buying a car, making a major purchase of any kind. And I submit that to adopt the appellate court decision in this case and to say that cashier's checks are now to be treated as demand notes subject to all of the defenses, and that's what it says and that's what we're left with, will effectively bring an end to cashier's checks. The reason, banks are going to get involved in litigation. They're going to have to make the determination of the propriety of the transaction as part of its issuance. And why would they ever want to do that? They are protected now. The able court says that they can be protected. I submit that there is a line of authority and an approach out there that says that that line of authority should be softened somewhat to weigh the importance of the cashier's check in commerce against the need for banks to protect themselves. Did able survive the total revisions to Article III? Up until the Second District, Judge, I submit that it did. All right. I don't mean to be flippant, but am I answering your question, sir? Yes. All right. You're giving me what your view is, but it still comes down to whether or not there was fraud and when that fraud occurred. Well, again, Judge, it's – I'm not disagreeing with you. I'm just saying that's the question. It's not only when did the fraud occur, but who can that fraud be attributed to, I submit, in this case. And, again, I'm aware of the manifest way to the evidence notions, and I submit, though, that there is a tendency simply to dismiss then those factual findings because, well, it's the manifest way to the evidence. I submit that that should not be done here, and I submit that the court should take a very close look at the factual finding because I think that the trial court was motivated not, in my view, not to find or to make that factual finding to support a fraud claim to defeat the cashier's check because, of course, the court awarded MidAmerica the amount of the cashier's check as the S&E of ETI, but rather to impose liability against someone. Because keep in mind, Hernandez wasn't a party to the suit. The bad guy, the real bad guy here, was not a party to the suit. He was – never had a claim leveled against him, and so I think that there was a need to pass on the liability. Again, I may be reading into this. For the reasons I've indicated, Your Honors, I would ask that the appellate court be reversed, and I think that it's clear that the matter should be remanded for a determination of attorney's fees once this court determines that attorney's fees are, in fact, proper under Section 3-411 of the code. Mr. Williams, Mr. Noble referred to Section 3-411 having to do with the refusal to pay the check and the compensation expenses and focused on the word wrongfully. And I don't recall. Is that a change under the statute, or was that in there pre-1992? Judge, that is not a change. Again, it's somewhat hard. Mr. Noble makes these arguments about these substantial revisions. Those are not contained within his brief. We did make the analysis, and again, I invite you to lay them down side by side. I didn't see a change in terms of the operative language of either section. And if there is ever a case for the wrongful refusal to pay, I submit that this is it, because we have a case where the law of the land, not just the law of the State of Illinois, the law of the land is you can't stop payment on a cashier's check, period. Thank you. Thank you, counsel. Case number 106804 will be.